IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| REGINALD ADKINS, #454312, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-02395 |
| | ) | |
| GERALD McALLISTER, Warden, | ) | Judge Campbell |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Reginald Adkins, a state prisoner incarcerated at the Northeast Correctional Complex in Mountain City, Tennessee, has filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus (ECF No. 1), challenging his 2010 conviction in the Criminal Court for Davidson County, Tennessee. The respondent has filed an answer in opposition to the petition, along with a complete copy of the underlying state-court record. With permission, the petitioner has filed a reply brief, and he also seeks the appointment of counsel.

The petition is ripe for review. For the reasons set forth herein, the petition will be denied and this action dismissed with prejudice.

## I.   PROCEDURAL BACKGROUND

On January 13, 2010, a jury convicted the petitioner of first-degree murder and attempted especially aggravated robbery. The trial court entered judgment and sentenced him to consecutive terms of life imprisonment plus twelve years. (Judgments, ECF No. 9-1, at 17–18.) The conviction and sentence were affirmed on direct appeal. *State v. Adkins* ("*Adkins I*"), No. M2010-00694-CCA-R3-CD, 2011 WL 856931 (Tenn. Ct. Crim. App. March 11, 2011), *perm. appeal denied*, 2011 Tenn. LEXIS 645 (Tenn. July 14, 2011).

The petitioner filed a timely *pro se* petition in the state court for post-conviction relief on December 5, 2011. (ECF No. 9-10, at 21–33.) The trial court appointed post-conviction counsel (ECF No. 9-10, at 34), who filed an amended petition. (ECF No. 9-10, at 36–42.) The trial court conducted a hearing on November 13, 2012 (*see* Post-Conviction Tr., ECF No. 9-11) and denied the petition. (Order, ECF No. 9-10, at 45–63.) That decision was affirmed on appeal as well. *Adkins v. State* ("*Adkins II*"), No. M2013-02481-CCA-R3-PC,

2014 WL 5502344 (Tenn. Ct. Crim. App. Oct. 31, 2014). The petitioner filed his *pro se* federal habeas corpus petition under 28 U.S.C. § 2254 in this Court on December 26, 2014. The respondent has filed an answer along with a complete copy of the underlying state-court record. The petition is timely, and this Court has jurisdiction.

## II.    STATEMENT OF FACTS

### A.    Facts Relating to Conviction

The Tennessee Court of Criminal Appeals summarized the testimony presented during trial as follows:[1]

> On November 6, 2007, Jared Collins ("the victim"), a white male, was shot and killed outside a market located at 839 Dickerson Pike in Nashville. In January 2008, a Davidson County grand jury returned a two-count indictment relating to the victim's death, charging that the Defendant, Brandy Lea Birdwell, and Darryl Dekezz Thompson committed the offenses of first degree felony murder and especially aggravated robbery. The Defendant's trial, which was severed from that of his co-defendants, was conducted on January 11–13, 2010.
>
> Annthonett Bethea testified that, on November 6, 2007, she waited in her car while her son went into the market on Dickerson Pike. Ms. Bethea saw a white male get out of his vehicle and have a brief conversation with two black men, approximately between the ages of seventeen and nineteen, who had approached from the alley between the market and the liquor store. She said that the white male walked toward the liquor store and that the shorter of the two black men also proceeded toward the liquor store. Ms. Bethea recalled that the taller black male went to the white male's car, opened the driver's door, and began searching for something. She said that the white man then came back from the liquor store and saw the black man in his car.
>
> At this point, all three men converged and had a conversation, although Ms. Bethea could not hear what they said. However, she witnessed one of the black men hold one side of the white man, while the other black man patted his body as if he was looking for something. She testified that she thought it was the shorter black male that was more aggressively touching the white man. She recalled that, when her son opened the door to get back in the car, she heard one of the black men say, "[G]ive me the damn money." Ms. Bethea also testified that she then saw that the shorter black man had a gun. She testified that she started moving her vehicle at that time because she was afraid.
>
> After she drove out of sight of the altercation, she heard a gunshot. Ms. Bethea testified that, as she drove around the store, she then saw the two black males jump into the bed of a white pickup truck. She recalled that she had seen the pickup truck parked on the side of the market when she arrived. Ms. Bethea stated that she saw a white female driving the pickup truck and that the vehicle left the parking lot very quickly. Ms. Bethea testified that she went back to the front of the store to see what happened to the white male. She went into the market and saw that he had been shot in his lower back.

---

[1] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Tearra Mayfield testified that, on November 6, 2007, she went to the market at 839 Dickerson Pike with the Defendant, Darrell Thompson, and Brandy Birdwell. Ms. Mayfield said that the Defendant is her stepbrother and that they lived in the same household. She stated that the foursome, whom [sic] had been together since about 1:00 p.m. that day, went to the market in Ms. Birdwell's white pickup truck and that she sat in the front passenger seat while the Defendant and Mr. Thompson sat in the fold-out seats in the extended cab. Ms. Mayfield testified that she saw the Defendant with a black revolver in his pocket that day. She recalled that she heard the Defendant and Mr. Thompson say that they were broke and needed some money. She said that they were "talking foolishness" and that she assumed they were going to get money by robbing someone.

Before heading to the market, Ms. Mayfield, the Defendant, Mr. Thompson, and Ms. Birdwell were at Ms. Mayfield's grandmother's house, located on Pennock Avenue. According to Ms. Mayfield, the Defendant and Mr. Thompson saw some people, one of whom was the victim, leave from across the street. Ms. Mayfield said that the four of them then left to go to the market. She recalled that Ms. Birdwell parked on the side of the market and the Defendant and Mr. Thompson got out of the truck. Although Ms. Mayfield could not see what happened, she heard "some tussling" and then a gunshot. Afterward, the Defendant and Mr. Thompson got into the bed of the pickup truck and yelled at Ms. Birdwell to leave the parking lot. The sliding back window between the cab and the bed was open, and Ms. Mayfield heard the Defendant and Mr. Thompson laughing and giggling. Then, she heard the Defendant say, "[D]id you see what I did to the nigger." When the group got to Cedar Hill Park, Ms. Mayfield saw the gun again, still in the Defendant's possession.

Christy Dean testified that she was with the victim on November 6, 2007, shortly before he was shot and killed. She recalled that the victim came over to her house on Pennock Avenue to visit with her then-fiancé and that the victim said he was going to go to the market. Ms. Dean accompanied the victim and went to a flooring store near the market.

As Ms. Dean returned from the flooring store, she saw that the victim was out of his vehicle and was scuffling with two black men, who were between the approximate ages of nineteen and twenty-five years old. She said that the victim had one hand in his pocket and was fighting them with one hand. She testified that the two men kept hitting the victim but that eventually he was able to run toward the market. She testified that, when the victim opened up the door to the market, he was shot in the back. Although she did not see the shooter's face, Ms. Dean testified that the shorter black man fired the shot.

Ms. Dean stated that she witnessed a white truck approach from the side of the store and that the two guys jumped into the bed of the truck. She testified that the driver of the truck was a white female that she recognized as someone who had visited Ms. Dean's neighbor's house before. Ms. Dean also said that she identified the driver of the white truck in a photo lineup.

On cross-examination, Ms. Dean admitted that she had bought prescription drugs from her neighbor, Ms. Mayfield's grandmother. She also acknowledged that the victim was addicted to pills.

Officer Po Cheng, employed by the Metropolitan Nashville Police Department, testified that, as he was responding to another call around 4:30 p.m. on October 6, 2007, he drove by the market at 839 Dickerson Pike and was flagged down by a large group of people, who told him that someone had been shot. Officer Cheng said that he went inside the market and located the victim, whom he described was "in bad shape." He recalled that the victim was making some gurgling noises and was not able to respond to questions.

Detective Paul Harris, of the Metropolitan Nashville Police Department, testified that he investigated the victim's homicide. Detective Harris recalled that, as a result of Ms. Dean's

identification of the driver of the pickup truck, he obtained a search warrant for Ms. Birdwell's residence. As a result of the search, he obtained a Colt revolver. Detective Harris stated that the revolver was loaded with six live rounds. He testified that he also recovered a .38 caliber shell casing and an unfired round from Ms. Birdwell's bedroom.

Detective Harris stated that he interviewed the Defendant on November 13, 2007, and that the Defendant signed a Miranda waiver form. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Detective Harris recalled his conversation with the Defendant as follows:

> He indicated that he rode in the bed of [Ms.] Birdwell's truck with [Mr.] Thompson, which is a person he refers to as D throughout the interview, and [Ms.] Birdwell and [Ms.] Mayfield. He indicated that the four of them had been at a home on Pennock Avenue and they had been drinking and smoking weed and taking Ecstasy that day. And he indicated that the three of them, meaning the three other than him, [Ms. Birdwell], [Ms. Mayfield] and [Mr. Thompson], must have come up with some plan to rob that he wasn't aware of. And he was seated on [Ms.] Birdwell's pickup truck on the tailgate in the bed of it. He wasn't clear. But he was outside the truck, either on the tailgate or in the bed. And [Ms. Birdwell] got in the truck and started driving, following the victim. And [Mr. Thompson] got in the bed of the truck with him and [Ms. Mayfield] got in the front seat and they went to the market.

> [Ms. Birdwell] parked on the north side of the market, as opposed to the front of the market. And they got out of the truck, meaning he and [Mr. Thompson] . . . got out of the truck. And he indicated in his interview that it was his intention to go to the store, but he did not ever get inside the store. Instead [Mr. Thompson] started talking to the victim. He claimed he wasn't privy to what they were speaking about. He didn't know what they were talking about. But, nonetheless, they spoke. And then the victim walked away.

> Then [Mr. Thompson] went to the victim's—I believe it's a Toyota [F]our-[R]unner that was parked outside the market, as well, and [Mr. Thompson] started going through the victim's truck. He opened the driver's side door and [the Defendant] indicated he stayed on the side of the truck. And [Mr. Thompson] indicated something to the effect of, come on, man, let's—I forget his exact quote—come on—he was encouraging him to some degree, come on, let's get this, let's do this, something along those lines. I forget his exact wording.

> And the victim soon thereafter came outside and saw [Mr. Thompson] going through the victim's truck. The victim then confronted [Mr. Thompson] and they got into a physical scuffle, an altercation, about having seen him going through his truck, his own property. He indicated that [Mr. Thompson] and the victim scuffled and [Mr. Thompson] was trying to go through his pockets. This is what [the Defendant] is telling me in the interview. That [Mr. Thompson] was trying to go through his pockets. And then he indicated the gun that [Mr. Thompson] was carrying fell to the ground. And then he said [Mr. Thompson] picked it up.

> . . . He indicated it was [Mr. Thompson] that possessed the weapon.

Detective Harris also testified that the Defendant told him the gun was Ms. Birdwell's and that it was registered to her mother. However, the Defendant acknowledged that his prints might

be found on the gun because he had touched it previously.

Regarding the Defendant's height, Detective Harris testified that the Defendant is 5'5", while Mr. Thompson is 5'11".

Dr. Adele Lewis, an Assistant Medical Examiner for the State of Tennessee, performed an autopsy on the victim on November 7, 2007. She testified that the victim suffered a gunshot wound to his back and that the bullet fractured the victim's right tenth rib, traveled through part of the victim's right lung, went through his heart, and hit one of the arteries that supplies blood to the heart. She testified that she recovered the bullet from the victim's chest and turned it over to the police. Dr. Lewis testified that the victim's cause of death was a gunshot wound to the torso and that his manner of death was homicide. Dr. Lewis also said that the victim's toxicology report indicated that hydrocodone and methadone were present in his blood.

Felicia Evans, a crime scene investigator with the Metropolitan Nashville Police Department, testified that she arrived at the scene of the shooting at approximately 5:25 p.m. She recalled that she recovered latent fingerprints from the victim's 1998 Toyota Four–Runner, which "was found with the driver door ajar and various items of paper and stuff kind of strewn about." Ms. Evans stated that she also processed a white 1999 Ford Ranger pickup truck that belonged to either Ms. Birdwell or her mother. In the Ford Ranger, she found a black purse with two cartridge casings inside, a cartridge casing in a compartment on the rear driver's side door, and two .38 caliber cartridge casings in the center console.

Special Agent Shelly Betts, employed by the Tennessee Bureau of Investigation, testified she examined the bullet recovered from the victim's chest and determined that it had been fired from the Colt revolver recovered at Ms. Birdwell's house.

Belinda Shea, a latent print examiner for the Metropolitan Nashville Police Department, testified that she examined the fingerprints collected from the victim's automobile and matched Mr. Thompson's fingerprints to the ones recovered from the outside of the driver's door. Ms. Shea stated that she matched fingerprints from the Defendant, Ms. Birdwell, Mr. Thompson, and Ms. Mayfield to latent prints recovered from Ms. Birdwell's white pickup truck. She also said that she examined the prints from the weapon recovered from Ms. Birdwell's home but that the prints could not be identified due to a lack of ridge detail.

Tewodros Tashu, a clerk at the market where the victim was shot, testified that, around 4:30 p.m. on November 6, 2007, he looked outside and saw three people—two black and one white—struggling. He was not sure whether they were fighting or playing, so he started to go outside to get a better look. He described what he saw when he opened the door: "I see that it was a serious fight. And one of them tried to come into the store. So I opened the door for him when I realized that it was a serious fight, somebody was trying to hurt someone." Mr. Tashu testified that, when he opened the door, the victim started to come into the store. At that point, Mr. Tashu heard gunfire and saw the other two men run toward the side of the building. Mr. Tashu took the victim back into his office, at which time the victim said, "[C]all the police, this is the only money I have. Please help me, help me, this is the only money I have. Please call the police."

The Defendant, twenty-one years old at the time of the trial, testified that, on November 6, 2007, he "was on weed, drinking alcohol heavily and popping Ecstasy." He described that he "was real drunk" and "blank[ed] in and out." The Defendant stated that he, Mr. Thompson, Ms. Birdwell, and Ms. Mayfield went to the market to get orange juice to mix with vodka. He recalled that they saw the victim, whom [sic] he claimed owed Mr. Thompson money for drugs, and that Mr. Thompson wanted to talk to the victim. He recalled the victim said he did not have any money and Mr. Thompson went into his vehicle and "told him he was going to take something for collateral until he get his money." The Defendant stated that,

when the victim came back and saw Mr. Thompson in his car, they got into an altercation. The Defendant testified that he did not touch the victim. According to the Defendant, Mr. Thompson had the gun and shot the victim.

The jury found the Defendant guilty of first degree felony murder and attempted especially aggravated robbery. The trial court sentenced him to consecutive terms of life imprisonment for his first degree felony murder conviction and twelve years, as a Range I offender, for his attempted especially aggravated robbery conviction.

*Adkins I*, 2011 856931, at *1–5 (alterations in original).

The Tennessee Court of Criminal Appeals summarized the evidence presented at the post-conviction

hearing as follows:

[T]rial counsel testified that he was appointed to represent the Petitioner in 2008 or 2009. He agreed multiple "discussion dates" were scheduled before setting the trial date. He could not remember the number of times he met with the Petitioner but said his investigator usually met more frequently with his clients until close to trial. The investigator, Pat Wells, usually conducted the initial interview and would have interviewed the witnesses listed in the indictment. Witnesses named in the police reports and those identified by a defendant were also interviewed. Counsel's usual practice was to visit with a client more frequently as the trial date approached. He assumed he followed his usual practice in this case.

Trial counsel testified that he met with the Petitioner at the jail and at the courthouse when discussion dates were scheduled. Counsel and the Petitioner discussed the case, the possible sentences, the State's evidence, the State's plea offer, and possible defenses. The State's plea offer included the Petitioner's pleading guilty to second degree murder outside his offender range for a forty-year sentence at 100% service. He conveyed the offer to the Petitioner, which he thought was at the final discussion date before the case was scheduled for trial. He told the Petitioner that he faced a possible life sentence for felony murder and fifteen to twenty-five years for especially aggravated robbery and that the trial court could order consecutive service if it found that the Petitioner was a dangerous offender. Counsel noted the court ordered consecutive service.

Trial counsel testified that the Petitioner understood the elements of the offenses with which he was charged because the Petitioner was adamant that he did not "go there" to rob anyone. The Petitioner claimed he was assisting his codefendant collect a drug debt. Counsel recalled the Petitioner and his codefendants had smoked marijuana and had drunk alcohol on the day of the killing. He said his usual practice was to ask the medical examiner on cross-examination about the effects of drugs and alcohol. He agreed he did not seek an expert to testify about the effects of marijuana and alcohol on the Petitioner. Counsel noted that the problem with an "I was so messed up I didn't know what I was doing" defense was the evidence showed the Petitioner fled after the shooting. Counsel thought that although the Petitioner might have been "high," the Petitioner knew what he was doing and attempted "to cover his tracks" after the shooting. He said who possessed the gun or who drove the truck was irrelevant because the State argued all of the parties were criminally responsible. He believed the Petitioner clearly understood this point.

Trial counsel testified that he interviewed John Spencer, a witness who told the police that he saw the robbery or the shooting while it was occurring and that the taller of the two black men held the gun. Counsel noted the taller man would have been the Petitioner's codefendant. He said Mr. Spencer "completely backed up from what he . . . originally said." Mr. Spencer admitted making the statement about the two black men, but after reflecting on the events, he was not sure what he saw. Counsel noted again that under the State's theory, it did not matter who held the gun.

Trial counsel testified that the majority of the State's case relied upon eyewitness testimony. Although he could not recall everyone who testified, he knew the store owner and a female customer testified. He said one of the Petitioner's codefendants also testified for the State. Counsel said his investigator interviewed the eyewitnesses who testified at the trial and compiled a summary of the interviews. He noted the interviews were also audio recorded. Counsel did not obtain an eyewitness identification expert because both a codefendant who testified against the Petitioner and the independent witness were of the same race as the Petitioner. This eliminated any cross-racial misidentification concerns. He noted the police told him that the female witness did not appear stressed after the robbery or when she identified the Petitioner.

Trial counsel testified that he first spoke to the Petitioner about testifying at the trial during one of the pretrial discussions. He said the Petitioner wanted to testify because he wanted to tell the jury that he did not go to the store to rob anyone. Counsel told the Petitioner that he would be subject to cross-examination. He said it was the Petitioner's decision whether to testify, and counsel noted that the Petitioner was the only witness who could testify that the Petitioner did not intend to rob anyone. He denied coercing the Petitioner into testifying.

Trial counsel testified that given the witness testimony at the trial, the only possible defense was that the Petitioner did not intend to commit a robbery. He hoped the jury would believe the Petitioner and find him not guilty of felony murder. He said he discussed this trial strategy with the Petitioner. The Petitioner told counsel that codefendant Thompson was "beaten out of this money and knew where [the victim] was going to be" that night. The Petitioner agreed to go with his friend to help collect the money. Counsel explained the elements of especially aggravated robbery and the concept of criminal responsibility, but the Petitioner did not care because he did not have the gun.

Trial counsel testified that codefendant Birdwell told the police that after the shooting, she heard the Petitioner and codefendant Thompson "bragging about what they had just done" to the victim. Counsel thought the case never should have gone to trial and said he attempted to express that opinion to the Petitioner. He said, though, convincing someone as young as the Petitioner to accept forty years' confinement at 100% service was almost impossible.

Trial counsel testified that he appealed the Petitioner's convictions. He said that he did not raise an issue regarding consecutive sentences because the trial court properly followed [*State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995),] after finding that the Petitioner was a dangerous offender. Counsel believed raising the issue would have been "borderline frivolous." He did not recall the prosecutor making any improper statements during his closing argument.

On cross-examination, trial counsel testified that in the Petitioner's police statement, he placed himself at the scene and that the Petitioner did not mention collecting a drug debt. He agreed Ms. Mayfield was the only witness who identified the Petitioner by name. Regarding the Petitioner's testifying at the trial, counsel said the Petitioner had to testify in order to present evidence of the Petitioner's intoxication and debt collection intention.

Upon questioning by the post-conviction court, trial counsel testified that the State tried a codefendant first and that he had reviewed the transcript from that trial before the Petitioner's trial began. The court noted this court's opinion in which it stated that Ms. Mayfield testified that the Petitioner and a codefendant were laughing after the shooting and that the Petitioner said, "[D]id you see what I did[?]" Regarding the appeal, counsel thought he raised sufficiency of the evidence in the context of the State's failure to show the Petitioner's mental state at the time of the shooting.

The Petitioner testified that trial counsel never visited him at the jail before the trial. He said a woman from counsel's firm visited him but denied Mr. Wells visited him. He said he spoke to counsel about the charges at a court discussion date close to the trial. He said that the meeting was brief and that they discussed "how much time they offered and what should [he] take." He denied discussing with counsel his right to testify or about the benefits and pitfalls of his testifying. He denied discussing with counsel the State's witnesses' potential trial testimony, the elements of the offenses with which he was charged, the State's evidence, or the discovery materials. The Petitioner said they discussed "in the weeks before the trial" his mental state at the time of the shooting, but he could not recall what he told counsel. He denied talking about what was "on [his] mind" at the time of the shooting.

The Petitioner testified that he and trial counsel discussed the Petitioner's intent at the time of the shooting. He told counsel, "[W]e had went to the store to get some orange juice and my codefendant, Darryl Thompson, had seen somebody that owed him some money. So I assisted him to . . . collect a debt." The Petitioner, though, also stated that he and counsel never discussed his intent. He denied knowing the defense theory before the trial. Regarding his testifying at the trial, the Petitioner said counsel told him that the Petitioner would be "getting on the stand." He denied knowing he had a choice of whether to testify.

The Petitioner testified that he did not provide trial counsel or his staff with names of potential witnesses because he did not meet with anyone to discuss them. He denied understanding before the trial the charges against him, the available defenses, the State's evidence against him, and the elements of the offenses.

On cross-examination, the Petitioner testified that he wanted a trial and trusted his lawyer to win. He agreed he admitted going to the store and having contact with the victim. He denied understanding the concept of criminal responsibility and said the only thing he and trial counsel discussed was the plea offer and "what we're going to court for." He said he went to court for first degree murder and attempted especially aggravated robbery. He could not recall if counsel discussed the State's evidence, how the law applied to the evidence, and the possibility of his being convicted of first degree murder. The Petitioner thought counsel should have called Mr. Spencer as a trial witness. He said he wanted a lot of things in a new trial to be different, including his "defense strategy." When asked how the strategy might be different in a new trial, he said he did not "forcefully collect" the money from the victim. He denied knowing what codefendant Thompson was going to do and claimed codefendant Thompson only said "collect money."

The Petitioner testified that although he did not want to testify at the first trial, he would testify at a new trial. He stated that he never said he was never going to testify at the trial. He said moments later that he wanted to testify at the original trial, although trial counsel coerced him into testifying. When asked to clarify if he wanted or did not want to testify, the Petitioner would not answer the question.

Upon questioning by the post-conviction court, the Petitioner testified that he recalled signing a document stating he wanted a trial and rejected the State's plea offer. He agreed trial counsel talked to him about the State's offer. When asked about the substance of his testimony at a new trial, he said, "I ain't have no intention of robbing one bit." He admitted, though, he testified previously that he did not have any intent to rob the victim. He denied understanding the legal concepts discussed during opening statements and closing arguments and said he did not ask counsel to explain them.

The Petitioner testified that in addition to Mr. Spencer, he wanted trial counsel to call codefendant Birdwell as a trial witness. The post-conviction court explained that it was not permissible, and the Petitioner denied knowing he could not call her as a trial witness. He denied wanting to call any other witnesses at the trial.

*Adkins II*, 2014 WL 5502344, at *5–9 (some alterations in original).

## III.    ISSUES PRESENTED FOR REVIEW

The petitioner presents the following claims for review in this Court:

(1) That he was deprived of his Sixth Amendment right to the effective assistance of counsel insofar as trial counsel

      (a) failed to adequately interview the petitioner;

      (b) failed to properly investigate the case;

      (c) failed to interview state witnesses Tearra Mayfield and Christy Dean;

      (d) failed to properly advise the petitioner regarding his right to testify (or not testify) in his own defense;

      (e) failed to evaluate the need for expert services (eye witness and toxicology);

      (f) made an improper legal argument in an effort to mitigate the attempted taking of the victim's property;

      (g) failed to object to the prosecutor's inflammatory and improper statements made during closing argument;

      (h) failed to move to suppress the signed *Miranda* waiver form; and

      (i) failed to raise an argument based on the petitioner's being convicted of first-degree murder, where the indictment charged him with felony murder.

(2) That the trial court lacked jurisdiction to enter a judgment of first-degree murder when the jury verdict was for felony murder, and the petitioner was not "indicted for common law form [of] first degree murder." (ECF No. 1, at 4.)

(3) That the "Petitioner could not be tried for felony murder and the underlying offense without being indicted for common law first degree murder." (ECF No. 1, at 6.)

The petitioner also argues that the waiver of any claims his post-conviction counsel failed to raise in post-conviction proceedings should be excused under *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309 (2012).

## IV.    STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court recently explained, AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. ----, 134 S. Ct. 10, 15 (2013).

AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has emphasized repeatedly that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," then relief is precluded under that provision. *Id.* at 101 (internal quotation marks and citation omitted). The Court admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks and citation omitted). Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. This is a very high standard, which the Supreme Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

## V.    EXHAUSTION AND PROCEDURAL DEFAULT

In addition to § 2254(d)'s limitations on the review of claims that *were* adjudicated on the merits in the state courts, AEDPA generally precludes habeas review altogether of claims that were not properly exhausted in the state courts or were procedurally barred by the state courts, except in very limited circumstances.

## A. Exhaustion

Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State," "there is an absence of available State corrective process," or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). Exhaustion occurs once a petitioner has "give[n] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).[2]

When a habeas court finds a claim to be unexhausted, it can, for good cause, stay the action and permit the petitioner to present his unexhausted claim to state court and then return to federal court for review of his perfected petition. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). The court need not wait for exhaustion, however, if it determines that a return to state court would be futile. *See id.* ("[E]ven if a petitioner had good cause for that failure [to exhaust claims in state court], the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless."); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

## B. Procedural Default

Even where a state prisoner has exhausted available state-court remedies, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). In addition, if a petitioner failed to fairly present a particular federal habeas claim to the state courts but has no remaining avenue available for doing so under state law, then the claim is deemed to be exhausted but procedurally defaulted. *Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

If a prisoner defaulted a federal claim in state court, review by the federal court is completely barred

---

[2] In Tennessee, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

unless the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) "failure to consider the claim would result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A petitioner can establish the requisite "cause" in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Second, constitutionally ineffective assistance of counsel constitutes cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective-assistance claim was not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53 (1992) (holding that post-conviction attorney error was not cause to excuse a default under the circumstances presented there). The holding in *Coleman* was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial-review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309, 1315, 1320 (2012) (creating exception to *Coleman* where state law prohibits ineffective-assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. ----, 133 S. Ct. 1911, 1921 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee).

The Supreme Court's creation in *Martinez* of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 1318–19, 1320. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has also recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496). This too is a very demanding standard, and not every claim of innocence will lead to review of a defaulted claim.

With these principles in mind, the Court turns to the examination of the claims raised in the petition for habeas relief.

## V. ANALYSIS AND DISCUSSION

### A. Fully Exhausted Claims of Ineffective Assistance of Counsel

The petitioner's claims that trial counsel was ineffective for failing to adequately interview and meet with him (Claim (1)(a)), failing to properly advise him regarding his right to testify or not testify (Claim (1)(d)), and failing to evaluate the need for expert services (Claim (1)(e)) were clearly exhausted in the state courts up through and including the post-conviction appeal to the Tennessee Court of Criminal Appeals.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that in order to successfully

claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

In the case at bar, the state court, in addressing the petitioner's ineffective-assistance claims, correctly articulated the standard established by *Strickland* and discussed at some length the proof necessary to establish both prongs of the *Strickland* test. It then summarized the evidence in the record and concluded, in light of the post-conviction court's belief of trial counsel's testimony instead of the petitioner's, that the petitioner had not established either that his counsel was ineffective or that he was prejudiced by any alleged deficiency. The appellate court ruled as follows:

> Regarding trial counsel's failure to meet with the Petitioner adequately and failure to discuss his right to testify at the trial . . . counsel's credited testimony shows that counsel's performance was not deficient and that there was no prejudice to the outcome of the proceedings. The record reflects that counsel met with the Petitioner at the jail and at the courthouse. Counsel and the Petitioner discussed the case, the possible sentences, the State's evidence, the State's plea offer, and possible defenses. Although the Petitioner rejected the State's plea offer, counsel told the Petitioner that he faced a possible life sentence for felony murder and fifteen to twenty-five years for especially aggravated robbery and that the trial court might order consecutive service after finding that the Petitioner was

a dangerous offender. We note the court ordered consecutive service. Counsel thought the case never should have gone to trial, and he attempted to express his opinion to the Petitioner. Counsel said, though, it was almost impossible to convince someone as young as the Petitioner to accept forty-years' confinement at 100% service. . . . The petitioner is not entitled to relief on this basis.

Regarding trial counsel's failure to discuss the Petitioner's right to testify at the trial, counsel first spoke to the Petitioner about testifying at the trial during one of the pretrial discussions. Counsel said the Petitioner wanted to testify because he wanted to tell the jury that he did not go to the store to rob anyone. Counsel told the Petitioner that he would be subject to cross-examination and cautioned the Petitioner about testifying but said it was the Petitioner's decision. Counsel denied coercing the Petitioner into testifying. We note the Petitioner's contradictory post-conviction testimony about whether he wanted to testify and his refusal to clarify his testimony on cross-examination. In any event, the Petitioner said that he wanted to testify at a new trial to establish that he did not intend to rob the victim. The record reflects, though, that the Petitioner testified at the trial that he did not intend to rob the victim, and he agreed with the post-conviction court that he testified accordingly at the trial. Counsel noted that given the witness testimony and the Petitioner's contentions that he was not holding the gun and only helping to collect a debt, the only possible defense was the Petitioner did not intend to commit a robbery. Counsel concluded that the Petitioner was the only witness who could testify regarding his intent because the Petitioner failed to mention the debt collection during his police interview. Counsel said he discussed this trial strategy with the Petitioner. Counsel did not provide deficient performance or prejudice the outcome of the trial, and the Petitioner is not entitled to relief on this basis.

Regarding trial counsel's failure to seek the services of experts in the fields of toxicology and eyewitness identification, the record reflects that counsel's performance was not deficient and that there was no prejudice to the outcome of the trial. Regarding the need for a toxicology expert, counsel testified that he knew the Petitioner drank alcohol and used drugs on the day of the shooting but chose not to present expert testimony regarding the effects of the drugs and alcohol. Counsel, pursuant to his usual practice, questioned the medical examiner at the trial about the effects and received favorable responses. Counsel said that although the Petitioner might have been under the influence of drugs and alcohol, the Petitioner knew what he was doing and attempted to "cover his tracks" after the shooting. Counsel noted that the problem with an "I'm so messed up I didn't know what I was doing" defense was the evidence showed the Petitioner fled the scene after the shooting. The proof at the trial supported counsel's conclusion. The trial evidence showed that after the shooting, Ms. Bethea saw the Petitioner and codefendant Thompson "jump into" codefendant Birdwell's truck, which left the store parking lot "very quickly." Ms. Mayfield testified that after the shooting, the Petitioner and codefendant Thompson entered the truck and yelled for codefendant Birdwell to leave the parking lot. Ms. Mayfield also heard the Petitioner laugh and say, "[D]id you see what I did[?]" Likewise, the store clerk testified that he saw two men run toward the side of the building after the shooting. We note that although the Petitioner told the police about his alcohol consumption and drug use, the Petitioner did not mention that he was intoxicated or impaired at the time of the shooting. The Petitioner is not entitled to relief on this basis.

Regarding the need for an eyewitness expert, trial counsel did not obtain a witness identification expert because Ms. Mayfield, the Petitioner's stepsister, was with the Petitioner and his codefendants on the day of the shooting. Ms. Mayfield testified that she saw the Petitioner with the gun earlier that day and that she heard the Petitioner and codefendant Thompson discuss robbing someone because they needed money. Although Ms. Mayfield was not charged with a crime, she heard a struggle and a single gunshot. After the shooting, Ms. Mayfield heard the Petitioner and codefendant Thompson laughing and the Petitioner ask, "[D]id you see what I did[?]" Ms. Mayfield knew the Petitioner and clearly identified him as a participant in the shooting. Likewise, counsel did not believe an expert was necessary

because the remaining witnesses who testified at the trial were the same race as the Petitioner and only identified the Petitioner and codefendant Thompson as two black men distinguished by their height. The trial proof showed that the Petitioner was about 5' 5", that codefendant Thompson was about 5' 11", that Ms. Bethea saw the short black man with a gun, and that Ms. Dean saw the short black man shoot the victim. Counsel was told the female witness did not appear stressed at the time of her police interview. Counsel concluded that any cross-racial misidentification concerns were eliminated.

We note that post-conviction counsel did not present any expert testimony regarding eyewitness misidentification. This court has concluded that when a petitioner claims counsel was ineffective by failing to call a witness at a trial, a petitioner generally cannot establish prejudice without presenting that witness at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757–58 (Tenn. Crim. App. 1990) (concluding that a post-conviction petitioner should produce a material witness "who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called" to establish his claim). The Petitioner is not entitled to relief on this basis.

*Adkins II*, 2014 WL 5502344, at *12–14.

This Court is not in a position to second-guess the post-conviction court's decision to credit the testimony of trial counsel over that of the petitioner at the hearing, and the evidence in the record clearly supported the appellate court's decision that the petitioner was not entitled to relief. In short, the decision regarding these three claims of ineffective assistance was not "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings" and it did not involve an unreasonable application of clearly established federal law. 28 U.S.C. §2254(d). The petitioner is not entitled to relief on the basis of these claims.

### B.     Unexhausted Ineffective-Assistance Claims

The petitioner raises two claims of ineffective assistance of trial counsel that were never at any time raised in his state post-conviction proceedings: that trial counsel "was ineffective for failing to move to suppress the signed waiver form" (ECF No. 1, at 10) (Claim (1)(h)), and for failing to raise an argument based on the petitioner's being charged and convicted of felony murder, when the judgment entered against him was for first-degree murder (*see id.* at 11) (Claim 1(i)). These claims were clearly defaulted because they were not raised at all in the state post-conviction proceedings. The petitioner asserts that the ineffective assistance of post-conviction counsel constitutes cause to overcome the procedural default of these claims.

As stated above, *Martinez* may permit a petitioner to overcome the procedural default of claims of ineffective assistance of trial counsel where there was either no post-conviction counsel or post-conviction counsel was ineffective, but only where "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*,

132 S. Ct. at 1318 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)). Thus for a claim to be found substantial for *Martinez* purposes, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) . . . the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336. Conversely, a claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Martinez*, 132 S. Ct. at 1319. While this standard is not particularly demanding, the Court must also consider whether the petitioner was actually prejudiced by the default. *Coleman*, 501 U.S. at 750.

In the present case, *Martinez* does not provide relief because neither of the defaulted claims is substantial. Regarding the *Miranda*-waiver issue, the petitioner argues only that his counsel knew he had signed a *Miranda* waiver and given a statement to the police, and that trial counsel should have but failed to investigate whether the petitioner "might have been induced into signing this waiver." (ECF No. 1, at 10.) The petitioner does not actually argue that he was wrongfully or fraudulently induced into signing the waiver or offer any other potential grounds for finding the waiver invalid, and he does not provide any other basis for suppression of the statement he gave to the police. Moreover, the petitioner could not establish that he was prejudiced by any purported failure of trial counsel, for purposes of *Strickland*'s prejudice prong, because the petitioner's testimony at trial was basically consistent with the statement he gave to the police. Both at trial and during his police interview, the petitioner stated that he was drunk and high at the time of the murder, that he went to the store with his friends but never had the intention to rob anyone, and that his friend and co-defendant, Darryl Thompson, was the person who shot the victim. (*Compare* Trial Tr. 92–98, ECF No. 9-2, at 98–104 (Officer Paul Harris's testimony regarding petitioner's statement to police) *with* Trial Tr. 222–26, ECF No. 9-3, at 108–12 (petitioner's trial testimony).) Thus, suppression of the statement to the police would not have had an appreciable effect on the outcome of the trial. This claim is not substantial, and the petitioner was not prejudiced by post-conviction counsel's failure to raise it.

Regarding the second claim, the petitioner was indicted on the charge of "kill[ing] **Jarrod Collins**, during the perpetration of or attempt to perpetrate **robbery**, in violation of Tennessee Code Annotated § 39-13-202." (Indictment Count 1, ECF No. 9-1, at 5 (bold font in original).) The jury found the petitioner guilty of "Count one felony murder." (ECF No. 9-1, at 16 (Criminal Court Minutes and Verdict).) The judgment reflects that the petitioner was charged and convicted of "First Degree Murder," in violation of Tenn. Code Ann. § 39-

13-202. (ECF No. 9-1, at 17.) The petitioner appears to be arguing that trial counsel was ineffective for failing to raise an argument regarding the discrepancy between the offense as charged in the indictment and of which he was found guilty by the jury (felony murder), and the offense as defined by the judgment entered by the trial judge (first-degree murder).

Under Tennessee law, first-degree murder is defined to include *both* "(1) [a] premeditated and intentional killing of another" *and* "(2) [a] killing of another committed in the perpetration of or attempt to perpetrate any . . . act of terrorism, arson, rape, robbery, burglary, [or] theft," among other predicate crimes. Tenn. Code Ann. § 39-13-202(a)(1)–(2). In other words, although commonly referred to as "felony murder," a murder committed in the perpetration of another serious crime is also first-degree murder in Tennessee, and any objection based on this distinction would have been erroneous as a matter of law. As a result, the claim that trial counsel was ineffective for failing to object on the basis that the court lacked jurisdiction to enter a judgment for first-degree murder is plainly not "substantial" for purposes of *Martinez*. The petitioner is not entitled to relief on the basis of this claim either.

### C. Partially Exhausted Claims of Ineffective Assistance of Counsel

Four of the petitioner's claims of ineffective assistance of trial counsel were raised in initial-review post-conviction proceedings, as they were included in counsel's amended petition: that counsel failed to properly investigate the case (Claim (1)(b)); failed to interview state witnesses Tearra Mayfield and Christy Dean (Claim (1)(c)); made an improper legal argument in an effort to mitigate the attempted taking of the victim's property (Claim (1)(f)); and failed to object to inflammatory and improper statements made by the prosecutor during his closing argument (Claim (1)(g)). (*See* Am. Post-Conviction Pet'n, ECF No. 9-10, at 39, 40.) Counsel, however, did not call Ms. Mayfield or Ms. Dean to testify at the post-conviction hearing, did not indicate what additional information might have been gleaned from interviewing them, and did not identify which of the prosecutor's statements were improper. In other words, counsel did not develop any evidence to support these claims. The trial court rejected these claims. (Post-Conviction Order, ECF No. 9-10, at 57, 61–62.)

On appeal, counsel referred to all of these claims except one (Claim (1)(g)) in the appellate brief (*see* Post-Conviction App. Br. at 5–6, ECF No. 9-13, at 6–7) as claims that were raised in the initial post-conviction petition, but she did not articulate them as claims on appeal, address them in the fact section of the appellate

brief, or discuss them in the argument section. (*See id. passim.*) The appellate court did not expressly rule on them. This Court concludes that these claims were not fully exhausted in the state court.

Although these claims were not fully exhausted by being presented to the state appellate court, the petitioner is barred by Tennessee's one-year statute of limitations, Tenn. Code Ann. § 40-30-102(a), and the state's one-petition rule, Tenn. Code Ann. § 40-30-102(c), from presenting any of the claims to the state courts now. The petitioner does not argue that any of the circumstances enumerated in Tenn. Code Ann. § 40-30-117(a) permit him to re-open his post-conviction petition in the Tennessee courts. The claims listed above are therefore considered to be exhausted (because no further state review is available) but procedurally defaulted (because they were never presented to the state appellate court), and may not be considered by the federal court on habeas review unless the petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 8 (1992) (failure to develop facts in state court constitutes procedural default, subject to *Coleman*'s cause-and-prejudice standard), *superceded in other part by statute*, 28 U.S.C. 2254(e)(2) (1996).

The petitioner asserts that the default of any of his claims resulting from the ineffective assistance of post-conviction counsel should be excused by *Martinez v. Ryan.* The Court understands the petitioner to be asserting that *Martinez* should excuse the default both because (1) post-conviction counsel was ineffective at the initial-review stage for raising the claims in the amended petition for post-conviction relief but then failing to fully develop the record regarding these claims at the evidentiary hearing; and (2) post-conviction counsel was ineffective for failing to present the claims in the post-conviction appeal.

*Martinez*, however, only excuses a default where post-conviction counsel was ineffective for failing to raise a substantial claim of ineffective assistance of trial counsel. *See Martinez*, 132 S. Ct. at 1318. *Martinez* clearly does not extend to the ineffective assistance of counsel during post-conviction appellate proceedings. *See Martinez*, 132 S. Ct. at 1320 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . ."). *Martinez* does not provide a basis for overcoming a default resulting from the ineffective assistance of post-conviction counsel during the appeal.

Regarding claims that were raised by post-conviction counsel in the initial-review proceedings and rejected by the trial court on the basis that the plaintiff had failed to present evidence to meet his burden of

showing that counsel was ineffective, most courts within the Sixth Circuit to consider the issue have held that *Martinez* does not support the conclusion that the failure of post-conviction counsel to thoroughly develop claims of ineffective assistance of counsel during the petitioner's post conviction hearing would serve as a basis to excuse a procedural default. *See, e.g.*, *Henderson v. Carpenter*, 21 F. Supp. 3d 927, 933 (W.D. Tenn. 2014) (despite the petitioner's argument that it was "'irrational' to distinguish failing to properly assert a federal claim and failing to properly develop the claim in state court," holding that "*Martinez* does not allow Petitioner to circumvent [*Cullen v. Pinholster*, 563 U.S. ----, 131 S. Ct. 1388 (2011)] and allow consideration of evidence that was not developed and presented in the state courts") (citing *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013); *Dixon v. Houk*, 737 F.3d 1003, 1012 n.2 (6th Cir. 2013)).

This Court does not reach the question of whether *Martinez* applies to the claims presented here. Instead, the Court finds that the petitioner is not entitled to relief on the basis of these claims because, even assuming that *Martinez* applies and that the defaulted claims are sufficiently "substantial," the petitioner has failed to show how he was prejudiced by the alleged failures of trial counsel, for purposes of *Strickland*, or of post-conviction counsel, for purposes of *Coleman*, as discussed above. More specifically, while the petitioner argues that counsel failed to properly investigate the case, he does not suggest what additional evidence might have been uncovered if counsel had performed further investigation, or how such evidence might have aided the petitioner's case. He claims that trial counsel was ineffective because he did not interview state witnesses Tearra Mayfield and Christy Dean, but he does not suggest what questions he should have asked them during trial that he did not, or should not have asked but did, as a result of not interviewing them prior to trial. He does not identify what improper legal argument his counsel made in effort to mitigate the attempted taking of the victim's property, or identify what inflammatory and improper statements were made by the prosecutor during his closing argument. In sum, the petitioner is not entitled to relief on the basis of any of the above-referenced ineffective-assistance claims.

D.    **Remaining Claims**

The petitioner's two remaining claims concern the discrepancy between the language used in the indictment and verdict and the language used in the judgment. The petitioner asserts that the trial court lacked jurisdiction to enter a judgment of first-degree murder when the jury verdict was for felony murder and he was not "indicted for common law form [of] first degree murder" (ECF No. 1, at 4) (Claim (2)); and that he "could

not be tried for felony murder and the underlying offense without being indicted for common law first degree murder" (ECF No. 1, at 6) (Claim (3)).

Neither claim (to the extent they differ in any material respect) was raised during the direct appeal or during post-conviction proceedings. The petitioner asserts that the procedural default of these claims should be excused by the ineffective assistance of his post-conviction counsel. Because these are substantive claims of error by the trial court, they would have had to have been raised on direct appeal rather than during post-conviction proceedings. The default occurred when appellate counsel failed to raise these issues during the appeal. Regardless, while *Martinez* may excuse the default of a substantial claim of ineffective assistance of trial counsel, it does not excuse the default of any other types of claims or the default of a claim of ineffective assistance of appellate counsel. *Martinez*, 132 S. Ct. at 1320; *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

And finally, as discussed above, even if the claims were properly presented, they are completely without merit, because felony murder is a form of first-degree murder under Tennessee law. Tenn. Code Ann. § 39-13-202(a)(2).

The petitioner is not entitled to relief on the basis of these claims.

## VI.    CONCLUSION

For the reasons set forth herein, Reginald Adkins's petition under § 2254 will be denied and this matter dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Under the standard articulated in *Miller-El*, the Court finds that none of the claims raised in Adkins's petition merits further review. A COA will not issue.

An appropriate order is filed herewith.

Todd Campbell
United States District Judge